Thomas J. Woodbury
Forest Defense, P.C.
618 Rollins St.
Missoula, MT 59801
(650) 238-8759
tom@wildlandsdefense.org

Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| ) | |
| NATIVE ECOSYSTEMS COUNCIL and ) | CV-17-    - |
| ALLIANCE FOR THE WILD ROCKIES ) | |
| ) | |
| Plaintiffs, ) | COMPLAINT FOR |
| ) | DECLARATORY AND |
| vs. ) | INJUNCTIVE RELIEF |
| ) | |
| LEANNE MARTEN, Regional Forester of ) | |
| Region One of the U.S. Forest Service, ) | |
| TONY TOOKE, Chief of the United States ) | |
| FOREST SERVICE, an agency of the ) | |
| Department of Agriculture, and WILLIAM ) | |
| AVEY, Helena-Lewis & Clark National ) | |
| Forest Supervisor, ) | |
| ) | |
| Defendants ) | |

# I. INTRODUCTION

1.  This is a civil action for judicial review, under the Administrative Procedure
    Act, of the U.S. Forest Service's (Forest Service) authorization of the
    Moose Creek Vegetation Project and the May 20, 2014 landscape-scale
    insect and disease designations for Montana under Section 602(d) of the
    Healthy Forest Restoration Act (HFRA) of 2003 (16 U.S.C. 6591a (Mon-
    tana 602 designations).

2.  Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies
    contest these decisions as arbitrary and capricious, an abuse of discretion,
    and/or otherwise not in accordance with law.

3.  Defendants' decisions violate the National Environmental Policy Act
    (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act
    (NFMA), 16 U.S.C. § 1600 *et seq.*, the HFRA, 16 U.S.C. § 6591a, and
    the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.  Plaintiffs request that the Court set aside the decisions authorizing the
    Moose Creek Vegetation Project and/or the Montana designations, pursuant
    to 5 U.S.C. § 706(2)(A) and enjoin implementation of the Project.

5.      Plaintiffs seek a declaratory judgment, injunctive relief, the award of

costs and expenses of suit, including attorney and expert witness fees,

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such

other relief as this Court deems just and proper.

## II.  JURISDICTION

6.      This action arises under the laws of the United States and involves the

United States as a Defendant. Therefore, this Court has subject matter ju-

risdiction over the claims specified in this Complaint pursuant to 28 U.S.C.

§§ 1331, 1346.

7.      An actual controversy exists between Plaintiffs and Defendants. Plaintiffs'

members use and enjoy the Helena-Lewis & Clark NF for hiking, fishing,

hunting, camping, viewing and photographing scenery and wildlife, and en-

gaging in other vocational, scientific, spiritual, and recreational activities.

Plaintiffs' members intend to continue to use and enjoy the area frequently

and on an ongoing basis in the future, including, but not limited to, use by

members that live and own homes near the Helena-Lewis & Clark NF.

8.      The aesthetic, recreational, scientific, spiritual, and educational interests

of Plaintiffs' members have been and will be adversely affected and

irreparably injured if Defendants implement the challenged decisions.

These are actual, concrete injuries caused by Defendants' failure to

comply with mandatory duties under NFMA, NEPA, HFRA, and the APA.
The requested relief would redress these injuries and this Court has the
authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 &
2202, and 5 U.S.C. §§ 705 & 706.

9.    Plaintiffs submitted timely written scoping comments concerning the
Moose Creek Project. No administrative remedies were provided by the
Defendants regarding the HFRA Montana 602 designations, which
Plaintiffs allege constitutes a programmatic decision subject to review
under NEPA, and that decision is ripe for review at this time, under the
facts of this case. Thus, Plaintiffs have exhausted administrative remedies,
and the Court has jurisdiction to review Plaintiffs' APA claims.

10.   Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)
(1).Defendant Marten, the chief representative for U.S. Forest Service
Region One, and the chief representative of the U.S. Forest Service in
the State of Montana, resides within the Missoula Division of the United
States District Court for the District of Montana.

## III. PARTIES

11.   Plaintiff  NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana
corporation with its principal place of business in Three Forks, Montana.
Native Ecosystems Council is dedicated to the conservation of natural re-

sources on public lands in the Northern Rockies. Its members use and will continue to use the Lewis & Clark National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the GNF, including the Moose Creek Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Moose Creek Project area in the Lewis & Clark National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems. Alliance for the Wild

Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13. Defendant WILLIAM AVEY is the Helena-Lewis & Clark National Forest (LCNF) Supervisor, and in that capacity is charged with ensuring that decisions made on the LCNF are consistent with applicable laws, regulations, and official policies and procedures.

14. Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Lewis & Clark National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

15. Defendant TONY TOOKE is the Chief of the United States Forest Service, an administrative agency within the U.S. Department of Agriculture, and as head of that agency he is responsible for the lawful management of our National Forests, including the Lewis & Clark National Forest, including but not limited to ensuring compliance with NEPA for any programmatic decisions he makes affecting how these forests are to be managed, such as implementing HFRA Section 602.

## V. PROCEDURAL BACKGROUND

16.   On February 27, 2017, Defendant Avey signed the Decision Memo for the

Moose Creek Vegetation Project in the LCNF, categorically excluding it

from NEPA. The only opportunity for public input for this project was in

the form of comments on the potential for a project in this area pursuant

to a scoping period initiated on September 16, 2016. Plaintiffs submitted

scoping comments appropriate to the notice of scoping, raising many of

the same issues that form the basis of this Complaint.

17.   The Agricultural Act of 2014 (P.L. 113-79, the 2014 farm bill) was signed

into law by President Obama on February 7, 2014. Section 602 of that

Bill provided that: ''(b) DESIGNATION OF TREATMENT AREAS.—

(1) INITIAL AREAS.—Not later than 60 days after the date of enactment

of the Agricultural Act of 2014, the Secretary shall, if requested by the

Governor of the State, designate as part of an insect and disease treatment

program 1 or more landscape-scale areas, such as subwatersheds (sixth-

level hydrologic units, according to the System of Hydrologic Unit Codes

of the United States Geological Survey), in at least 1 national forest in

each State that is experiencing an insect or disease epidemic. (2) ADDI-

TIONAL AREAS.—After the end of the 60-day period described in para-

graph (1), the Secretary may designate additional landscape-scale areas

under this section as needed to address insect or disease threats.

18.   On May 20, 2014 - 98 days after the date of enactment of the Farm Bill -
      Defendant Chief Tooke designated 4,955,159 acres of National Forest lands
      in Montana  for eligibility to be excluded from NEPA study and analysis
      pursuant to Section 8204 of the Agriculture Act of 2014 (Public Law
      113-79), amending Title VI of the Healthy Forests Restoration Act of 2003
      (HFRA) (16 U.S.C. 6591 et seq.).

19.   No NEPA analysis, solicitation of public comment, or administrative review
      and appeal process was made available for this sweeping designation by the
      Chief, though Moose Creek would not have been eligible for a categorical
      exclusion from NEPA without it. As such, Plaintiffs have exhausted their
      administrative remedies in relation to the 2014 designation, and now chal-
      lenge it in the context of implementation at the site-specific level.

20.   According to supporting documentation for the Moose Creek Project: "The
      Moose Creek project would not occur in occupied grizzly bear habitat."
      Thus, the forest plan standard for protection of grizzly bears was not ap-
      plied, and there was no consultation under the ESA.

21.   Subsequent to this determination, however, there has been a confirmed
      sighting of a 3-year-old grizzly bear on the eastern flank in the central por-
      tion of the Big Belt mountain range west of White Sulphur Springs. In
      news reports (e.g., July 19 Missoulian), area biologist Jay Kolbe noted that
      grizzly tracks were first seen in May but were inconclusive until the report-

ed photo confirmed those suspicions. "We've been getting sporadic reports for a couple of years in the Big and Little Belts from people we'd otherwise trust, but it takes something like this to confirm it," Kolbe informed the press. Kolbe also confirmed that it could be an indication that the bear has taken up residence in the area.

22.    By certified letter dated July 25, 2017, Plaintiffs formally requested that the challenged decision be re-considered in order to apply the forest plan standards and guidelines for consistency with grizzly bear habitat needs.

23.    As of the date of the filing of this Complaint, Plaintiffs are not aware that the Forest Service has advertised, awarded, or commenced any commercial timber sales for the Moose Creek Project.

## VI. FACTUAL BACKGROUND

### Canada Lynx Issues

24.    About 67 percent of lynx habitat in the Northern Rocky Mountains occurs on pubic lands managed by the Forest Service and Bureau of Land Management (2003 FR Vol. 68, No. 128, p. 40089). The agencies noted that forest fragmentation may eventually become severe enough to isolate lynx habitat into small patches, thereby reducing the viability of wildlife that are dependent upon larger areas of forest habitat.

25.    Intensive tree harvesting can eliminate the mosaic of habitats and mix of

forest stand age classes that promote lynx survival (2000 FR Vol. 65 No. 58, p. 16071).

26.    Partial forest thinning commonly carried out as fuels reduction also adversely impacts habitat connectivity for lynx. *Squires et al.* (2013). Dense forests utilized by lynx for connectivity purposes are those with a canopy cover of 60% or greater (*Ibid*., Table 1, p. 190).

27.    The Moose Creek Project is situated in Lynx linkage habitat generally, and in an area of the forest that has been heavily logged in relation to forest density found in the preferred habitats of Lynx and other fur-bearers, like pine marten.

28.    The Moose Creek Project includes, cumulatively, at least 1,270 acres (2 square miles) of clearcuts, which includes 15 openings with an average size of 85 acres. This is in addition to 5,088 acres of previous clearcuts in the project area, for a total cumulative clearcut acreage 6,358 acres (9.9 square miles).

29.    Thus, there is a significant issue with cumulative fragmentation of Lynx linkage habitat associated with logging that precludes categorically excluding projects like Moose Creek.

30.    At no point did the Chief consider the potential cumulative (indirect) impacts of the Montana Section 602 designation of eligible forest landscapes

on Lynx connectivity.

31.     Neither the scoping letter nor the decision memo for Moose Creek men-

tions, let alone considers, the potential for cumulative impacts on Lynx or

other wildlife species from forest thinning, fire suppression, prescribed

burning, and clearcutting.

32.     According to FWS, large portions of Montana are identified as unoccupied

secondary lynx habitat, with limited amounts of occupied secondary habitat

within close distances of core areas, and the long-term recovery of Canada

Lynx in Unit 5 depends upon retaining connectivity through secondary habi-

tat areas like the Little Belt Mountains.

33.     In spite of the recovery requirement that lynx populations remain connected

to the source population in Canada, the Lynx Amendment does not require

connectivity to be maintained between these core areas, and does not pro-

vide any measurable criteria for analyzing habitat connectivity.

34.     The Forest Service updated the management strategy for unoccupied sec-

ondary areas set forth in the Lynx Amendment (ILBT 2013) with no public

involvement, and without subsequent Forest Plan amendment.

35.     The effect of the "update" of the Lynx Amendment referenced in the previ-

ous paragraph was to downgrade the conservation value of unoccupied sec-

ondary lynx habitat, including the elimination of the Lynx Amendment's re-

quirement that LAUs be mapped across their geographic range.

36.    Indirect adverse impacts on long-term persistence attributable to this failure of the Lynx Amendment to ensure connectivity between lynx populations in the two widely-separated core areas was summarily dismissed by the Forest Service (Lynx Amendment FEIS, p. 323), and were also not considered in designating over 7,000 square miles of national forest in Montana for inclusion for eligibility for forest thinning projects.

37.    Current best science defines "connectivity" for lynx as a function of movement between patches and the likelihood that patches are suitable for resident populations (*Squires et al.* 2013).

38.    Retention of lynx habitat connectivity requires not only that lynx can move through a given landscape, but that sufficient suitable habitat is actually provided to allow for lynx survival.

39.    High volumes of logging traffic over a number of years across the Moose Creek Project Areas could significantly disrupt lynx migration through this designated corridor.

40.    Impacts of timber harvest on the pine marten is considered by the Forest Service to be a good indicator for impacts to a whole suite of furbearers that depend upon mature and over-mature forested habitat in the LCNF.

41.    In a recent research report on the Pacific pine marten, another forest carni-

vore that avoids forest openings and is a management indicator species for lynx (i.e., mature and/or old-growth related species), *Moriarity et al.* (2016, Abstract) reported that fuels treatments which simplify forest stands through removal of understory trees and logs negatively affected marten movements and habitat connectivity.

42.  *Moriarity et al.* (2016) was before the decision maker for the challenged project.

43.  When overly large landscapes are used as the basis for analyzing vegetation impacts on lynx, such as the 80,000+ acre LAU identified for Moose Creek, individual lynx home ranges can be eliminated without analyzing the potential impacts of such fragmentation on movement and long-term recovery.

44.  The Lynx Amendment ROD (p. 32) notes that the conservation value of areas outside of lynx core habitat is unclear, though FWS acknowledges that secondary areas may contribute to lynx persistence by providing habitat to support lynx during dispersal movements or other periods.

45.  The management strategy for unoccupied secondary areas in the Lynx Amendment was recently "updated" by an interagency team (ILBT 2013) - with no public involvement and without Forest Plan amendments - downgrading the conservation value of unoccupied secondary habitat as needed only for nonresident, dispersing lynx.

**Grizzly Bear Issues**

46.     Adult male grizzly bears inhabit home ranges approximately 50 square miles in size, which is the approximate size of grizzly bear management units in the northern Rockies.

47.     According to the Forest Service, recent confirmed sightings of a young adult grizzly bear in the vicinity of the Moose Creek Project Area, together with earlier evidence of grizzly presence, indicate that there is now a resident grizzly bear in the area of the Moose Creek project.

48.     The Forest Service did not apply relevant LCNF standards for the protection of grizzly bears in categorically excluding the Moose Creek Project from further NEPA review and analysis.

49.     The grizzly bear sighting is significant new information and/or changed circumstances requiring the Forest Service to reconsider its decision approving the Moose Creek Project.

50.     The Moose Creek Project is no longer consistent with the LCNF Plan, and the "no effect" determination for grizzly bear is unsupported by the record in light of the presence of grizzly bear(s) in the vicinity of the project area.

**Wildfire Science**

51.     *Schoennagel et al* (2004) states: "we are concerned that the model of historical fire effects and 20th-century fire suppression in dry ponderosa pine

forests is being applied uncritically across all Rocky Mountain forests, including where it is inappropriate []."

52.  *Schoennagel et al* (2004) states: "High-elevation subalpine forests in the Rocky Mountains typify ecosystems that experience infrequent, high-severity crown fires []. . .  The most extensive subalpine forest types are composed of Engelmann spruce (Picea engelmannii), subalpine fir (Abies lasiocarpa), and lodgepole pine (Pinus contorta), all thin-barked trees easily killed by fire. Extensive stand-replacing fires occurred historically at long intervals (i.e., one to many centuries) in subalpine forests [], typically in association with infrequent high-pressure blocking systems that promote extremely dry regional climate patterns []."

53.  *Schoennagel et al* (2004) states: "it is unlikely that the short period of fire exclusion has significantly altered the long fire intervals in subalpine forests []. Furthermore, large, intense fires burning under dry conditions are very difficult, if not impossible, to suppress [], and such fires account for the majority of area burned in subalpine forests []."

54.  *Schoennagel et al* (2004) states: "Moreover, there is no consistent relationship between time elapsed since the last fire and fuel abundance in subalpine forests [], further undermining the idea that years of fire suppression have caused unnatural fuel buildup in this forest zone."

55.    *Schoennagel et al* (2004) states: "No evidence suggests that spruce–fir or lodgepole pine forests have experienced substantial shifts in stand structure over recent decades as a result of fire suppression. Overall, variation in climate rather than in fuels appears to exert the largest influence on the size, timing, and severity of fires in subalpine forests []. We conclude that large, infrequent stand replacing fires are 'business as usual' in this forest type, not an artifact of fire suppression."

56.    *Schoennagel et al* (2004) states: "Contrary to popular opinion, previous fire suppression, which was consistently effective from about 1950 through 1972, had only a minimal effect on the large fire event in 1988 []. Reconstruction of historical fires indicates that similar large, high-severity fires also occurred in the early 1700s []. Given the historical range of variability of fire regimes in high-elevation subalpine forests, fire behavior in Yellowstone during 1988, although severe, was neither unusual nor surprising."

57.    *Schoennagel et al* (2004)(emphasis added) states: "Mechanical fuel reduction in subalpine forests would not represent a restoration treatment but rather a departure from the natural range of variability in stand structure."

58.    *Schoennagel et al* (2004) states:   "Given the behavior of fire in Yellowstone in 1988, fuel reduction projects probably will not substantially reduce the frequency, size, or severity of wildfires under extreme weather conditions."

59.   *Schoennagel et al* (2004) states:  "The Yellowstone fires in 1988 revealed that variation in fuel conditions, as measured by stand age and density, had only minimal influence on fire behavior. Therefore, we expect fuel-reduction treatments in high-elevation forests to be generally unsuccessful in reducing fire frequency, severity, and size, given the overriding importance of extreme climate in controlling fire regimes in this zone. Thinning also will not restore subalpine forests, because they were dense historically and have not changed significantly in response to fire suppression. Thus, fuel-reduction efforts in most Rocky Mountain subalpine forests probably would not effectively mitigate the fire hazard, and these efforts may create new ecological problems by moving the forest structure outside the historic range of variability."

60.   Likewise, *Brown et al* (2004) states:  "At higher elevations, forests of subalpine fir, Engelmann spruce[], mountain hemlock [], and lodgepole or whitebark pine [] predominate. These forests also have long fire return intervals and contain a high proportion of fire sensitive trees []. At periods averaging a few hundred years, extreme drought conditions would prime these forests for large, severe fires that would tend to set the forest back to an early successional stage, with a large carry-over of dead trees as a legacy of snags and logs in the regenerating forest . . . . natural ecological dynamics

are largely preserved because fire suppression has been effective for less

than one natural fire cycle.   Thinning for restoration does not appear to be

appropriate in these forests []. Efforts to manipulate stand structures to re-

duce fire hazard will not only be of limited effectiveness [] but may also

move systems away from pre-1850 conditions to the detriment of wildlife

and watersheds [].”  “Fuel levels may suggest a high fire 'hazard' under

conventional assessments, but wildfire risk is typically low in these

settings.”

61.    Likewise, *Graham et al* (2004) states:   “Most important, the fire behavior

characteristics are strikingly different for cold (for example, lodgepole pine,

Engelmann spruce, subalpine fir), moist (for example, western hemlock,

western red cedar, western white pine), and dry forests []. Cold and moist

forests tend to have long fire-return intervals, but fires that do occur tend to

be high-intensity, stand-replacing fires. Dry forests historically had short in-

tervals between fires, but most important, the fires had low to moderate

severity.”

62.    Plaintiffs brought all of the above fire ecology science to the attention of the

Defendants in scoping comments for Moose Creek, requesting that these

studies and their implications be considered in designing the project.

63.    Defendants failed to consider any of the fire ecology science quoted above.

**Other Issues**

64.    The wolverine, a candidate for listing under the Endangered Species Act, is a wide-ranging Management Indicator Species for the LCNF which is known to inhabit the Little Belt Mountains.

65.    The best available science for wolverine shows that it is highly sensitive to habitat disturbances associated with the "human footprint."

66.    The Forest Service failed to assess the potential direct, indirect and cumulative impacts of Moose Creek Vegetation Project on wolverine, and failed to consider the best available science for wolverine in relation to the habitat disturbance that will result from vegetation management in the Project Area.

67.    The Forest Service failed to assess the potential direct, indirect and cumulative impacts of Moose Creek Vegetation Project on northern goshawks and woodpeckers, as well as their prey base, and failed to consider the best available science for these species in relation to the habitat disturbance that will result from vegetation management in the Project Area.

68.    The Forest Service decided to log smaller stands of old growth habitat as part of the Moose Creek project, due to minimum acreage requirements in the forest plan.

69.    The Forest Service failed to maximize the retention of large snags in its decision for Moose Creek.

## VII.  CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Defendant Tooke violated NFMA, ESA and NEPA in implementing
the Farm Bill Categorical Exclusion.

1. All above paragraphs are incorporated by reference.

2. NEPA allows a federal agency to adopt a categorical exclusion for a "category of actions which do not individually *or cumulatively* have a significant effect on the human environment." 40 C.F.R. §1508.

3. In implementing the Insect & Disease Categorical Exclusion created under the Farm Bill, it was incumbent upon the Chief, in the exercise of his delegated authority, to consider the potential significance of cumulative indirect impacts from designation, and to designate eligible areas in such a manner as to avoid cumulative effects on the human environment.

4. Because designating "treatment areas" pursuant to 16 U.S.C. § 6591(a) has the indirect effect of allowing projects in those areas to proceed under NEPA without an EA or EIS (eligible projects in designated areas "may be . . . considered an action categorically excluded" pursuant to § 6591b), such designations could potentially have cumulatively significant impacts on the human environment.

5. Designating nearly five million acres of national forestlands in Montana is an example of how such an exercise of statutory authority could create the poten-

tial for significant cumulative environmental impacts, and thus result in a vio-

lation of NEPA and its implementing regulations.

6.   In order to avoid such potentially significant cumulative impacts in designat-

ing millions of acres of treatment areas in Montana pursuant to 16 U.S.C. §

6591(a), which constitutes a programmatic decision that effectively changes

the way national forests are to be managed, the Chief was obligated to conduct

NEPA analysis prior to any final designations.

7.   Had the Chief solicited public input on proposed designations of the forest

lands included for eligibility in his programmatic decision implementing 16

U.S.C. § 6591(a), one issue that would surely have been raised is the potential

cumulative impacts on migration corridors for Canada lynx connecting the

GYE core habitat to the source populations in Canada, including the effects on

connectivity in the Crazy Mountains generally, and the Moose Creek project

area in particular.

<u>SECOND CLAIM FOR RELIEF</u>

<u>Defendants Approval of Moose Creek Project Violates NEPA and NFMA by fail-
ing to consider the potential for cumulative impacts of forest thinning, prescribed
burning and clearcuts on wildlife habitat and diversity of species</u>

1.   All above paragraphs are incorporated by reference.

2.   The Northern Rockies Lynx Management Direction (hereafter "Lynx

Amendment") is a violation of the Endangered Species Act (ESA) because

lynx persistence in the southern core habitat is not protected by science-based,

objective standards requiring maintenance of habitat connectivity to the northern core habitat and Canada, even though lynx recovery requires population persistence in this southern core habitat.

3. The absence of protective standards for connectivity of lynx habitat in secondary habitat areas adopted pursuant to recommendations in accord with best available science violates the ESA, since according to *Squires et al.* (2013): *"Maintaining the integrity of these connectivity corridors is of primary importance to lynx conservation in the Northern Rockies."*

4. The Biological Assessment for Canada lynx is not based on the best scientific information available for the protection of connectivity between the GYE core habitat and source populations of lynx.

5. Substantial uncertainty exists concerning the connectivity of lynx habitat in and through the Moose Creek project area, sufficient to preclude categorically excluding further habitat degradation from study under NEPA. 36 C.F.R. § 220.6(c).

6. The cumulative impacts of past, present and proposed timber harvest on lynx habitat and connectivity in the Moose Creek project area represents a potentially significant cumulative impact that jeopardizes recovery and long-term persistence of lynx populations in the Northern Rockies, and thus at a minimum requires an environmental assessment in order to determine the degree of significance under NEPA.

7. In light of the importance of maintaining connectivity through migration corridors like the Crazy Mountains, recent science indicating that connectivity requires suitable habitat for resident populations, and the recovery-orientation of the ESA, any cumulative degradation of lynx habitat that impairs connectivity is a significant ecological and environmental concern that necessitates a hard look under NEPA.

8. The update of the management strategy for unoccupied secondary areas set forth in the Lynx Amendment by the an interagency team (ILBT 2013) - with no public involvement, and without Forest Plan amendment - which had the effect of downgrading the conservation value of unoccupied secondary lynx habitat and eliminating the Lynx Amendment's requirement that LAUs be mapped across their geographic range was a potentially significant forest plan amendment that required at least an EA pursuant to NEPA. 36 C.F.R. §§ 219.14, 220.4.

9. The failure to consider the potential for cumulative impacts to Lynx habitat connectivity and wildlife species and diversity in considering the Moose Creek project violates NEPA and NFMA.

THIRD CLAIM FOR RELIEF

Defendants Approval of the Moose Creek Project violates the Farm Bill (HFRA)

1. All above paragraphs are incorporated by reference.

2. The Farm Bill requires the Forest Service to "consider[] the best available

scientific information to maintain or restore the ecological integrity, including

maintaining or restoring structure, function, composition, and connectivity"

of affected areas prior to excluding them from further analysis under NEPA.

3.  The Defendants failed to consider the best available science for fire ecology

    brought to their attention by Plaintiffs; namely, *Schoennagel et al* (2004),

    *Brown et al* (2004), and *Graham et al* (2004).

4.  The Forest Service failed to consider the best available scientific information

    for maintaining and/or restoring the ecological integrity, including but not

    limited to maintaining or restoring structure, function, composition, and con-

    nectivity of wildlife habitat, in approving Moose Creek.

5.  The Forest Service failed to demonstrate that it has designed treatments in

    Moose Creek in such a way as to maximize retention of old growth and large

    trees, including but not limited to smaller stands of old growth habitat and

    large snags.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award

the following relief:

A.  Declare that the agencies violated/are violating the law;

B.  Vacate the Chief's designation of treatment areas in Montana;

C.  Vacate the Decision Memo for the Moose Creek Project;

D.    Permanently enjoin implementation of the Moose Creek Project;

E.    Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees under the ESA and/or under EAJA; and

F.    Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 20th Day of October, 2017.



*/s/ Thomas J. Woodbury*
*Thomas J. Woodbury*
FOREST DEFENSE, PC

Attorneys for Plaintiffs