Mark C. Phares
Ada C. Montague
Special Assistant Attorneys General
State of Montana Department of Natural Resources and Conservation
PO Box 201601
Helena, MT 59620-1601
(406) 542-4217; (406) 444-1451
mphares@mt.gov,
amontague@mt.gov
*Counsel for Montana Department of Natural Resources and Conservation*

Melissa Schlichting
Deputy Attorney General
Montana Department of Justice
PO Box 201401
Helena, MT 59620-1401
(406) 444-2026,
MSchlichting@mt.gov
*Counsel for State of Montana Attorney General*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| NATIVE ECOSYSTEM COUNCIL, and ALLIANCE FOR THE WILD ROCKIES,<br><br>      Plaintiffs,<br><br>vs.<br><br>LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, TONY TOOKE, Chief of the United States FOREST SERVICE, an agency of the Department of Agriculture, and WILLIAM AVEY, Helena-Lewis & Clark National Forest Supervisor,<br><br>                    Defendants. | CV 17-153-M-DWM<br><br><br>**STATE OF MONTANA'S AMICUS CURIAE BRIEF** |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................... 1

II.  MONTANA LAW AND NEPA CATEGORICAL EXCLUSIONS ................. 4

    A. Montana Law Pertaining to Timber Resources ........................................ 4

    B. The Categorical Exclusion is Proper in this Instance ............................... 5

    C. The USFS Properly Designated Priority Treatment Areas .................... 10

III. COLLABORATION AS PART OF EVALUATING HFRA COMPLAINT ................................... 11

IV.  PRECEDENTIAL IMPACT TO PUBLIC HEALTH AND SAFETY ............ 14

V.   CONCLUSION ................................................................................................ 14

The Montana Department of Natural Resources and Conservation (DNRC) and the State of Montana Attorney General (Attorney General) (collectively "State") hereby submit this *Amicus Curiae Brief*.

## I. INTRODUCTION

The State has broad statutory mandates to protect public safety and welfare, promote forest health, minimize wildland fire danger, provide wildland fire suppression, promote forest products industries, and protect watersheds from insect and disease infestation and fire.  The State often achieves these broad mandates by cooperating with federal land management agencies.

This litigation involves the United States Forest Service's (USFS) Moose Creek Vegetation Project (Project).  While the State agrees generally with Federal-Defendants' argument with respect to the Plaintiffs' standing, the State defers to those arguments.  See, Doc. 29, 4-8.  The USFS designed the Project to maintain and restore the Project area, which has been adversely impacted by insect and disease infestation.  Administrative Record (AR) 0003723.  The Project will improve the health and vigor of live trees, recover value of dead and dying trees, and contribute to timber supply. *Id.*  The Project will also fulfill two of the State's mandates: the reduction of fire risk, and the improvement of watershed conditions. *Id.*  The Project calls for the treatment of 2,195 acres, including 52 acres of aspen

restoration, 45 acres of whitebark pine enhancement, and 2,024 acres of commercial harvest. AR 0003728 at 8.

Mountain pine beetle, spruce budworm, and dense stand conditions plague many of the stands in the Project area. AR 0003972-73; Exhibit A; Decl. of Rod Brewer (Doc. 14-4) ¶¶ 7-8; Decl. of Jason Toddhunter (Doc. 14-2) ¶ 7; Decl. of Julia Altemus (Doc 14-3) ¶ 11. Moreover, the majority of the Project area lies within the wildland urban interface (WUI). DNRC participated in the Project's Environmental Policy Act (NEPA) process by submitting comments. AR 0003972-73; Exhibit A. In general, the DNRC comments focused on the collaborative nature of the Project, on concerns regarding employment and wood products, and on sustainable forest management. *Id*. The DNRC comments also noted its contribution towards culvert upgrade and repair, and associated site restoration. *Id*. In particular, the DNRC comments were supportive of the actions to improve age class and structural diversity, to reduce fuels and fire risk in the WUI [wildland urban interface] and to promote whitebark pine stands. *Id*. The DNRC comments pointed out that reducing fuels and improving forest resiliency to insects and disease helps create safer working environments for firefighters, which is part of being a good neighbor to adjoining federal and private landowners. *Id*.

The Healthy Forests Restoration Act (HFRA), as amended in the 2014 Farm Bill, both furthers the State's mandates and clarifies the way state and federal

agencies collaboratively cooperate in hazardous fuels reduction projects that protect "at-risk communities and watersheds." 16 U.S.C.A. §6513(a. The 2014 Farm Bill amendments provide authority for the Project.  Agricultural Act of 2014, Pub. L. No.113-79, Title VIII, §8204, 128 Stat. 649, 915-17 (2014), Healthy Forests Restoration Act §§601-04, 16 U.S.C. §§6591-6591c; AR 0031604 at 267-69.  Indeed, the Project falls within the 2014 designation of landscape-scale areas experiencing insect or disease infestations recommended by Montana Governor Steve Bullock, and later adopted, with a slight acreage adjustment, on May 20, 2014, by the then USFS Chief Tidwell.  AR 031574-75.

Furthermore, as the DNRC comments state: "The Project is also important in achieving Governor Bullock's Forest in Focus objectives by: 1) restoring forests and watersheds, while reducing fire risk and improving wildlife habitat; 2) developing the project collaboratively at the local level and 3) providing sustainable timber to local mills and contractors."  AR 0003972.

Collaborative restoration projects are an innovative solution developed through years of refining forest management at federal and state levels.  As pointed out by the Federal Defendants and Intervenor Defendants in their respective Briefs (Docs. 29, 33), Plaintiffs' specific arguments regarding the Categorical Exclusion (CE) the USFS employed appear both misplaced and inaccurate, as nothing in 16 U.S.C. §6591b(a)(2) dictates an extraordinary circumstances analysis.

## II. MONTANA LAW AND NEPA CATEGORICAL EXCLUSIONS

### A. Montana Law Pertaining to Timber Resources

There exists a host of state legislative support for the categorical exclusion, as that CE relates to insect and disease infestations, and the resulting fire hazard, relied on by the USFS for the Project. The following summarizes the statutory framework that prompted the State's request to file an amicus brief in this case:

- Mont. Code Ann. § 76-13-702(9)(b) allows DNRC "to intervene in litigation or appeals on federal forest management projects that involve fuel-loading conditions that the department considers to be a significant threat to public health and safety or to hamper watershed restoration and protection."

- Mont. Code Ann. § 76-13-301 provides that "It is further the public policy of the state to independently and through cooperation with the federal government and private forest landowners adopt measures to control, suppress, and eradicate outbreaks of forest insect pests and tree diseases."

- Mont. Code Ann. § 76-13-702(3) provides that DNRC shall "promote forest management activities within and adjacent to the wildland-urban interface and promote the implementation of community wildfire protection plans."

- Mont. Code Ann. § 76-13-104(5), - 301(1)(b) address protection, conservation and restoration of water resources and watersheds that are most affected by insects and tree diseases.

- Mont. Code Ann. § 76-13-104(9) Establishes a Good Neighbor Authority that allows the State Forester to enter into cooperating agreements with federal partners to engage in forest management and education activities related to the reduction of wildland fire risk and intensity on federal land designated as falling in the WUI. The DNRC and Forest Service are currently working on an agreement to implement portions of the Project using the Good Neighbor Authority.

Categorically excluded insect and disease treatment areas under the Agricultural Farm Bill Act of 2014 amendment to HFRA (2014 Amendment) complement Montana law regarding timber resources. See Mont. Code Ann. §76-13-301(2) (2013).

The 2014 Farm Bill Amendment categorical exclusion for qualifying insect and disease infestations on National Forest System lands balances the need to control forest pests and diseases with the sustainable forest management. Similarly, Montana recognizes that forests are "vital to conserving the state's natural resources and their economic and ecologic potential for the benefit of all Montanans." Mont. Code Ann. §76-13-701 (2013). Also in line with the 2014 Amendment, the Montana legislature promotes a collaborative approach to achieving the goal of meeting the diverse and often disparate needs of all Montanans on forested lands. Mont. Code Ann. §76-13-701(5).

### B. The Categorical Exclusion is Proper in this Instance

Wildland fire management and disease control are justified in the interest of protecting forests and the human environment and welfare at large. There exists neither a functional or legal extraordinary circumstance in the case of either Governor Bullock's nomination or Chief Tidwell's May 20, 2014 designation, discussed below in subsection I.C. Neither action outweighs the statutorily mandated state-wide goal of managing wildfire safely and eliminating disease

infestation zones. Additionally, this Court, sitting in equity as it does, may weigh human health and safety in the context of the challenges brought by Plaintiffs.

CEs are "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. §1508.4. The agency 'shall provide for extraordinary circumstances in which [the] normally excluded action may have a significant environmental effect.' *Id*. Thus, an agency must determine that extraordinary circumstances do not exist before relying on a CE in a particular instance. See *Utah Envtl. Cong. v. Russell*, 518 F.3d at 821 ('[T]he presence of an extraordinary circumstance precludes the application of a categorical approach.'). *Utah Envtl. Cong.* further clarifies that, 'To determine whether extraordinary circumstances exist, [an agency] must consider if the proposed action may have a potentially significant impact on certain 'resource conditions.'" *Id*. (citing Forest Service Handbook, Ch. 30 §30.3, at 2). *Wildearth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314, 1321–22 (D.N.M. 2009). See, e.g., *Mashack v. Jewell*, 149 F. Supp. 3d 11, 34–36 (D.D.C. 2016)(applying the arbitrary and capricious test). The Interior Board of Land Appeals (IBLA) also tends to be deferential. See, e.g., ANR Co., 182 IBLA 248, 271 (2012)(stating that the Board will uphold reliance on a categorical exclusion if it is reasonable and supported by the record).

If used properly, categorical exclusions reduce paperwork and delay. If used improperly, categorical exclusions can diminish NEPA's environmental goals, compromise transparency, and diminish the opportunity for public participation. 75 Fed. Reg. at 75632. To be suitable, a categorical exclusion "should clearly define the eligible category of actions, as well as any physical, temporal, or environmental factors that would constrain its use." *Id*. An agency may use tiering to "incorporate findings from previous NEPA environmental reviews that address broad programs or issues into reviews that subsequently deal with more specific and focused proposed actions." *Id.* (citing 40 C.F.R. §1502.4(d), 1502.2, 1508.28). If an extraordinary circumstance is present, such as the presence of a threatened or endangered species, further analysis through an environmental assessment (EA) or environmental impact statement (EIS) may be necessary unless addressed by the agency's NEPA implementing procedures. *Id.* at 75633.

The 2014 Amendment added two new sections to address disease and insect infestation on National Forest System lands. 16 U.S.C.A. §6591a. The new sections were properly written to constrain any potential for significant impacts by limiting certain physical, temporal, and environmental factors. The new sections allow treatment areas, considered high priority landscapes due to disease and insect infestation, to be identified and categorically excluded under NEPA. *Id*.; 40 C.F.R. §1508.4 (1977). To qualify, the treatment areas must be experiencing declining

CV 17-153-M-DWM
STATE OF MONTANA'S AMICUS CURIAE BRIEF 7

forest health, at risk of substantially increased tree mortality, and in an area where the risk of hazard trees "poses an imminent risk to public infrastructure, health, or safety." 16 U.S.C.A. §6591a(c).  An insect and disease project cannot exceed 3,000 treated acres, must be in the WUI, or in Condition Classes 2 or 3 in Fire Regime Groups I, II, or III if outside the WUI, and may not include the establishment of permanent roads.  16 C.F.R. §6591b(c).  Projects must maximize old growth and large trees "to the extent the trees promote stands that are resilient to insect and disease threats." 16 C.F.R. §6591b(b)(1)(A).  Projects must consider the best available science and must be developed and implemented through a collaborative process.  16 C.F.R. §6591b(b)(1)(B),(C).  Finally, projects cannot be in a designated wilderness area, in areas where removal of vegetation is prohibited or restricted by Presidential proclamation, or in areas that would be inconsistent with the applicable Land and Resource Management Plan.  16 C.F.R. §6591b(d).

     The 2014 Amendment used the best available science, and properly limited any cumulative impacts to endangered species through the Forest Service's NEPA implementing procedures.  The State concurs with the Federal Defendants' analysis of the "best available science" [Doc. 29].  Additionally, to create the Project, the Forest Service had to follow the procedures outlined in the Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, which references a 2002 memo from the Council on Environmental Quality (CEQ)

regarding EAs.  USFS, *The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide* (2004) (USFS Field Guide).

The Decision Memo for the Project complies with the NEPA implementing procedures of the Forest Service.  AR 0003728.  The analysis that went into the Decision Memo included a Biological Evaluation and Wildlife Report that considered threatened, endangered, candidate, and sensitive wildlife species.  *Id.* at 12.  A Biological Assessment was completed for Canada lynx and, after consultation with the US Fish and Wildlife Service, it was found the project "may affect but is not likely to adversely affect" the species. *Id*.  A Programmatic Biological Assessment for Wolverine found that the project would not likely jeopardize its continued existence. *Id*.  An addendum to the Biological Assessment contemplated the impacts of the Project on the grizzly bear and found that the Project "will have discountable and/or insignificant effects to the grizzly bear." AR0032619.  The analysis performed is comparable to the level of review analyzed, and found sufficient, to address the extraordinary circumstances in *Ilano*. *Ctr. for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063, 1070–71 (E.D. Cal. 2017).  In that case, the court found that, Plaintiff "...primarily takes issue with the factual conclusions of the biological evaluation and decision memo, rather than the process for reaching them. … Scientists might disagree about the decision memo's conclusion about the project's effects on the spotted owl, but it was supported by

the Forest Service's careful explanation, as well as the evidence in the record.  At a minimum, it was not arbitrary or capricious." *Id.*; 5 U.S.C. §706(2)(A).  Similarly here, Plaintiffs take issue with the conclusions reached by the USFS.  However, the present administrative record shows that there has been careful evaluation and documentation of the impacts the project will have.

### C. The USFS Properly Designated Priority Treatment Areas

On March 19, 2014, the Secretary of Agriculture sent letters to the Governors of all states with national forests seeking input, within the 60-day enactment period of the 2014 Amendment to HFRA, on insect and disease area designations.  USFS, Insect and Disease Area Designations, https://www.fs.fed.us/managing-land/farm-bill/area-designations (accessed July 13, 2018); 16 U.S.C.A. §6591a(b)(1).  After Governor Bullock's response, then-USFS Chief Tidwell designated treatment areas in Montana.  AR 0031574-75.

The level of review for identifying Montana's treatment areas was proper.  The limitations placed on the categorical exclusion constrain potential cumulative impacts and avoid the need for further NEPA review through an EA or EIS at the project level.  The Project was developed in accordance with valid USFS NEPA implementing procedures.

## III.     COLLABORATION AS PART OF EVALUATING HFRA COMPLAINT

Plaintiffs' participation in a collaborative effort to address the concerns they raise under HFRA are lacking.  Plaintiffs' complaint indicates that "[n]o NEPA analysis, solicitation of public comment, or administrative review and appeal process was made available for this sweeping designation by the Chief, though Moose Creek would not have been eligible for a categorical exclusion from NEPA without it.  As such, Plaintiffs have exhausted their administrative remedies in relation to the 2014 designation, and now collaterally challenge it in the context of implementation at the site-specific level."  Complaint at 8.  However, the 602 designations are connected to the 603 administrative review, which establish the criteria for a collaborative restoration project and connect them to the requirements of the Collaborative Forest Landscape Restoration Program (CFLR).  16 U.S.C.A. §6591b(b).

Furthermore, State law supports the CE and the Project.  Initially, Mont. Code Ann. §76-13-701(5) provides that "[t]he legislature declares that it is the policy of this state to promote the sustainable use of all public forests within the state through sound management and collaboration with local, state, and federal entities." Mont. Code Ann. §76-13-702 then provides that DNRC "shall participate in and facilitate collaboration between traditional forest interests in reaching consensus-based solutions on federal land management issues."

Federal authority includes 16 U.S.C.A. §6514 (2003), within HFRA, that provides: "[i]n order to encourage meaningful public participation during preparation of authorized hazardous fuel reduction projects, the Secretary shall facilitate collaboration among State and local governments and Indian tribes, and participation of interested persons, during the preparation of each authorized fuel reduction project in a manner consistent with the Implementation Plan."

DNRC is required to limit fuel-loading conditions that threaten public health and safety, and allow for defensible space around residences that make firefighting more safe and effective.  Mont. Code Ann. §§76-13-104 – 115 - 702(9)(b). Moreover, DNRC is directed to, "promote forest management activities within and adjacent to the wildland-urban interface and promote the implementation of community wildfire protection plans." Mont. Code Ann. §76-13-702(3).

Plaintiffs are not members of, nor did they participate in, the collaborative efforts of these diverse groups.  Moreover, the input provided by Plaintiffs' scoping comments for the Project request EIS level information, even though the area was categorically excluded and called for in the Meagher County Community Wildfire Protection Plan (CWPP). Collaboration around the management of forest lands is an increasingly necessary and functional way to address the wide array of user needs, both human and wild.  By providing input at foundational levels of a

forest management project, collaborative groups are shaping the way their neighboring forest areas are managed.

Given the complex issue of forest management, it makes sense that the most functional solutions are being developed by collaborative forest-management efforts.  The Project was developed through three public scoping meetings and one field trip.  Electronic mail updates were sent to everyone on the interested person list, and were posted to the Project website between meetings.  Feedback from these meetings and the field trip was used to develop the purpose, need, and proposed action.  Plaintiffs showed initial interest, and were sent updates, but did not participate in the collaborative effort, in accordance with the CFLR.  While admittedly still maturing, these collaborative efforts are moving the debate over forest management away from the courtroom and towards functional on-the-ground solutions.  The CFLR program was created through the Omnibus Public Land Management Act of 2009, and has officially identified 23 projects across the United States, ranging in size from 130,000 to 2,400,000 acres.  16 U.S.C.A. §7303.  The success of these efforts is increasingly apparent, and there are now 22 active collaborative groups working in Montana.

The State asks that this Court conclude that participation in a forest collaborative be a prerequisite to a challenge of the designation of treatment areas

or collaborative forest management plans under HFRA.  16 U.S.C.A. §§6591a, 6591b.

## IV. PRECEDENTIAL IMPACT TO PUBLIC HEALTH AND SAFETY

A challenge seeking injunctive relief to a federal agency's categorical exclusion under NEPA must be substantiated by a showing of irreparable harm, and reviewed by a balancing of the equities, as well as the public interest "in the preservation of the forest and its resources." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007) (internal citations omitted).  Typically, jurisprudence has held that "if the environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*; (internal citations omitted).

## V. CONCLUSION

Montana's history with significant wildfires demonstrates that, left unchecked, a wildland fire can be more destructive to ecosystem vitality than an accurately evaluated and designed timber harvest.  Furthermore, the public interest in environmental integrity must be balanced against the public interest in health and safety.

The State has a vested interest in furthering forest restoration efforts across the West, which speaks to the broad public interest in fire-related air quality

impacts as well as fire fighter safety. Regional efforts to further share information and establish best practices is also in the public interest.

The State's duties will be more cumbersome and expensive if the properly designated priority treatment areas are held to be an invalid use of a categorical exclusion under NEPA. Moreover, if the Project is held invalid under HFRA, all projects with subjectivity as to impacts on wildlife and old growth trees located in the designated treatment areas will be impeded.

Respectfully submitted this 13th day of July 2018.

By /s/ Mark C. Phares
    Mark C. Phares
    Ada C. Montague
    Special Assistant Attorneys General
    Montana Department of Natural
    Resources and Conservation


By /s/ Melissa Schlichting
    Melissa Schlichting
    Deputy Attorney General
    Montana Attorney General's Office

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(d)(2)(E)

I certify that this brief contains 3170 words, exclusive of caption and certificates of service and compliance.

By /s/ Mark C. Phares
Mark C. Phares
Ada C. Montague
Special Assistant Attorneys General
Montana Department of Natural
Resources and Conservation

## CERTIFICATE OF SERVICE

I certify that on July 13, 2018, I filed the foregoing document with the clerk of the court for the United States District Court for the District of Montana. Participants in the case, identified below, who are registered cm/ecf users will be served by the cm/ecf system. Participants in this case who are not registered cm/ecf users will be served via U.S. mail, postage prepaid.

| | |
|---|---|
| THOMAS J. WOODBURY<br>Forest Defense, P.C.<br>618 Rollins St.<br>Missoula, MT 59801<br>(650) 238-8759<br>tom@wildlandsdefense.org | TYLER M. ALEXANDER<br>United States Department of Justice<br>Environment and Natural Resources<br>Division<br>Natural Resources Section<br>(202) 305-0238<br>tyler.alexander@usdoj.gov |

/s/ Mark C. Phares