IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



**FILED**

NUV 1 9 2018

Clerk, U.S. District Court
District Of Montana
Missoula

NATIVE ECOSYSTEM COUNCIL,
and ALLIANCE FOR THE WILD
ROCKIES,

          Plaintiffs,

vs.

LEANNE MARTEN, et al.,

          Defendants,

and

MONTANA WOOD PRODUCTS
ASSOCIATION, et al.,

          Defendant-Intervenors.

CV 17–153–M–DWM

OPINION
and ORDER

This case concerns challenges to two decisions of the United States Forest

Service ("Forest Service"): (1) the Forest Service Chief's designation of

approximately five million acres in Montana ("Designation") pursuant to the 2014

Farm Bill Amendment to the Healthy Forests Restoration Act ("HFRA") and (2)

approval of the Moose Creek Vegetation ("Project") via categorical exclusion.

Having considered the plaintiffs' challenges, summary judgment is granted in

favor of the defendants.

1

## I.  Montana Landscape Designation

In 2014, the Healthy Forests Restoration Act ("HFRA") was amended to provide for the designation of "landscape-scale areas" in the National Forests of any state experiencing insect infestations and/or disease. Pub. L. No. 113-7, § 8204, 128 Stat. 649, 915–17 (2014 (codified at 16 U.S.C. §§ 6591a, 6591b). The amendment provided a 60-day period within which the Secretary, "if requested by the Governor of the State," was required to "designate as part of an insect and disease treatment program 1 or more landscape-scale areas . . . experiencing an insect or disease epidemic." 16 U.S.C. § 6591a(b)(1). The Secretary delegated this authority to the Forest Service Chief. AR0003722. At the subsequent request of Montana Governor Steve Bullock, Forest Service Chief Thomas Tidwell designated 4,955,159 acres as threatened landscapes in Montana. AR0003740. The Project area was part of the Designation. *Id.*; AR0003722–23.

For a project to fall within the purview of treatment projects addressed by HFRA, it must (1) not exceed 3,000 acres and (2) be limited to areas in the wildland-urban interface or Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface. 16 U.S.C. § 6591b(c). Such projects may not establish permanent roads, but may repair existing roads and construct temporary roads. 16 U.S.C. § 6591b(c)(3). A project cannot be located in a

congressionally designated Wilderness or Wilderness Study Area, or in areas

where the removal of vegetation is restricted or prohibited by statute or by

Presidential proclamation. 16 U.S.C. § 6591b(d). Additionally, public scoping

must occur and any such project must be consistent with the applicable land and

resource management plan for the relevant unit of the National Forest System. 16

U.S.C. § 6591b(e), (f).

## II.    The Moose Creek Vegetation Project

The Project falls in the Little Belt Mountains within the Helena-Lewis and

Clark National Forest in central Montana. AR0003722. It is therefore subject to

the Lewis and Clark National Forest Plan (1986). *See* AR0001385–982. The

Project area includes commercial harvest and pre-commercial thinning on

approximately 2,200 acres, AR0003727–28, as well as road maintenance and road

reconstruction, AR0003728. The Project was initially proposed in March 2016,

and scoping was initiated in September 2016. AR0003739. The plaintiffs

participated in the scoping process. See AR0003982–4278. The Decision Memo

was issued February 27, 2017. AR0003718-62.

The purpose of the Project "is to maintain or restore the structure, function,

composition and connectivity of a forest system that has been adversely affected

by insect and disease." AR0003723. The need for treatment was determined

based on observations of existing conditions, findings in the Little Belts Landscape

3

Assessment (2014), information from resource specialists (i.e. insect and disease aerial detection surveys), and input from collaborative process participants.[1] AR0003723. Currently, tree stands in the Project area are experiencing ongoing tree decline and mortality from insect activity. AR0003725. "The primary insects and diseases significantly impacting forest vegetation in the project area are mountain pine beetle . . . , western spruce budworm . . . , and lodgepole pine dwarf mistletoe . . . ." AR0004398. Treatments include thinning, prescribed fire, and timber harvesting. AR0003723. The Project "will remove lodgepole pine susceptible to mountain pine beetle, create stand conditions with a low mountain pine beetle hazard, and remove the sources of continual dwarf mistletoe infection to the lodgepole understory." AR0003725.

### III. Procedural History

Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies ("Plaintiffs") commenced this suit on October 20, 2017. (Doc. 1.) The Complaint makes factual allegations regarding the violation of the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the Healthy Forest Restoration Act ("HFRA"). Only three claims are actually pled, however: (1) the Designation was

---

[1] Participants included local landowners, a livestock permitee, a fire official from Meagher County, a conservation organization, Montana Fish, Wildlife and Parks biologists, and a timber company representative. AR0003729.

4

implemented in violation of NFMA, ESA, and NEPA, (*id.* at 20–21); (2) approval

of the Project violated NEPA and NFMA for failing to consider cumulative

impacts of forest thinning, prescribed burning, and clearcuts, (*id.* at 21–23); and (3)

approval of the Project violated HFRA, (*id.* at 23–24).

In May 2018, Plaintiffs filed their substantive summary judgment briefing,

(Doc. 12), and, four days later, sought to amend their complaint to delete their ESA

allegations and add claims under NFMA, (*see* Docs. 16, 16-1). That motion was

denied and the part of Plaintiffs' briefing addressing non-pled claims, (Doc. 12,

Section VII), was stricken. (Doc. 21.) While the original complaint remains

operative, (*id.*), Plaintiffs have only briefed four claims. Plaintiffs first argue that

the Designation violated NEPA. The remainder of Plaintiffs' challenges are

project-specific, arguing that the Forest Service failed to (1) consider cumulative

impacts in violation of NEPA; (2) maximize old growth in violation of HFRA; and

(3) consider the best available science as required by HFRA.

In May 2018, Meagher County and the Montana Logging and Montana

Wood Products Associations were given leave to intervene. (Doc. 22); *see* Fed. R.

Civ. P. 24(a)(2). Additionally, the State of Montana sought and received leave to

file an amicus brief, focusing on the Project's impact on the State's mandates to

protect public safety and welfare, promote forest health, minimize wildland fire

5

danger, provide wildland fire suppression, promote forest products industries, and protect watersheds from insect and disease infestation and fire. (Doc. 40.)

## LEGAL STANDARDS

### I. Administrative Procedure Act

NEPA claims are reviewed under the Administrative Procedure Act ("APA"), which requires that a court "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). Because HFRA includes no private right of action, agency actions under HFRA are also reviewed under the APA. *Cf. Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the [APA].").[2] An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference

---

[2] HFRA does contain a judicial review provision, but it pertains to (1) venue, (2) expeditious completion of judicial review, and (3) injunctions. 16 U.S.C. § 6516.

in view or agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## II. Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Eng'r Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (alteration in original) (internal quotation marks omitted).

ANALYSIS

## I. Standing

The Forest Service first argues that Plaintiffs lack standing because they filed only one standing declaration containing insufficient evidence of concrete and particularized injury. To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To show injury in fact, a plaintiff must show that an

7

injury is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 1548. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). A generalized allegation of harm will not suffice, but an allegation of harm to a recreation or aesthetic interest may be sufficient. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). "[R]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Cantrell v. City of Long Beach*, 241 F.3d 674, 680 (9th Cir. 2001) (internal quotation marks omitted).

Plaintiffs, as the party seeking to invoke the court's jurisdiction, bear the burden of establishing standing. *Lujan*, 504 U.S. at 561. Unlike the pleading stage, where Plaintiffs were merely required to allege facts demonstrating each element, *Spokeo, Inc.*, 136 S. Ct. at 1547, at summary judgment Plaintiffs "can no longer rest on such 'mere allegations' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for the purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561.

Here, Plaintiffs' standing is based on the declaration by Sara Johnson. (Doc. 17.) That declaration was filed on May 8, 2018, four days after Plaintiffs' summary judgment motion, (*id.*), and then "clarified" with a further declaration on

8

June 22, 2018, (*see* Doc. 37). Ms. Johnson states that she has visited different

areas within the Little Belt Mountains, but she "ha[s] not been specifically in [the

Project area] of the mountain range." (Doc. 17 at ¶ 7.) Ms. Johnson further avers a

planned site visit on July 11, 2018, and future visits in 2018 after Project activities,

if any, occur. (*Id.*) In her supplemental declaration, Ms. Johnson more firmly

states that she has "concrete plans and a firm intention to visit the Project area in

the summer of 2019 and in September of 2020." (Doc. 37 at ¶ 7.) As argued by

the Forest Service, it is a unique case where a plaintiff cannot show that a single

member of their respective organizations has ever actually been to a project area.

However, given Ms. Johnson's concrete plans for the future, Plaintiffs have shown

use of the affected area and that its members, specifically Ms. Johnson, are persons

"for whom the aesthetic and recreational values of the area will be lessened by the

challenged activity." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d

1141, 1149 (9th Cir. 2000) (internal quotation marks omitted). Plaintiffs have

standing to pursue this action.

**II.  NEPA**

NEPA requires agencies to take a "hard look" at the potential environmental

consequences of contemplated actions before making final decisions to proceed.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

"Although these procedures are almost certain to affect the agency's substantive

decision . . . NEPA itself does not mandate particular results, but simply prescribes

the necessary process." *Id.* The "hard look" under NEPA may require the

preparation of an environmental impact statement ("EIS"). 42 U.S.C. § 4332(C);

40 C.F.R. § 1508.11. To determine whether an EIS is necessary, an agency may

prepare an environmental assessment ("EA"). 40 C.F.R. §§ 1501.4(b),(c), 1508.9.

If preparation of an EA shows the impacts of the contemplated action will not be

significant, the agency may issue a Finding of No Significant Impact. 40 C.F.R.

§§ 1501.4(e), 1508.13. An agency may also promulgate categorical exclusions

from NEPA review for actions "which do not individually or cumulatively have a

significant effect on the human environment." 40 C.F.R. § 1508.4. If a proposed

action falls within a categorical exclusion, the agency is not required to prepare an

EA or EIS. *Id.* "An agency satisfies NEPA if it applies its categorical exclusion

and determines that neither an EA nor an EIS is required, so long as the application

of the exclusions to the facts of the particular action is not arbitrary and

capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1446 n.5

(9th Cir. 1996) (*as amended* June 17, 1996).

## A.    Designation (Count 1)

On August 1, 2018, this Court held that the Designation did not constitute

final agency action and NEPA review was not required because the nature and

extent of future, individual projects under the Designation was speculative. *See*

*Native Ecosystems Council v. Erickson*, CV 17-53-M-DWM, (Doc. 47 at 21–24)

(D. Mont. Aug. 1, 2018). Plaintiffs' motion for summary judgment is therefore

denied insofar as they challenge the Designation under NEPA.

### B. "Extraordinary Circumstances" (Count 2)

Plaintiffs further argue that the Project presents significant cumulative

impacts and therefore does not qualify for categorical exclusion under NEPA. As

mentioned above, a federal action may be "categorically excluded" from a detailed

environmental analysis if it does not "individually or cumulatively have a

significant effect on the human environment." 40 C.F.R. § 1508.4. NEPA analysis

is generally required, however, for a categorically-excluded action if there are

"extraordinary circumstances in which a normally excluded action may have a

significant environmental effect." *Id.*

Under HFRA, treatment projects such as the Moose Creek Project are

"categorically excluded" from NEPA review by statute. *See* 16 U.S.C.

§ 6591b(a)(1). The Forest Service argues that unlike regulatory exemptions under

NEPA that require an "extraordinary circumstances" review to ensure a normally

excludable project does not have "a significant environmental effect," 40 C.F.R.

§ 1508.4, statutory exemptions, such as the one here, have no additional

requirement for extraordinary circumstances review if not specifically provided for

in the statute. Here, § 6591b merely states that "a project described in subsection

(b) that is conducted in accordance with section 6591a(d) of this title may be . . .

considered an action categorically excluded from the requirements of NEPA." 16

U.S.C. § 6591b(a). Absent from § 6591b is any reference to the "extraordinary

circumstances" procedure outlined in 40 C.F.R. § 1508.4. *Compare with* 16

U.S.C. § 6554(d)(2)(B) (providing for a categorical exclusion for silviculturalist

assessments and research, specifically including an "extraordinary circumstances"

review requirement). The Forest Service insists that Congress's omission of

"extraordinary circumstances" review in § 6591b is determinative. *See Russello v.*

*United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular

language in one section of a statute but omits it in another section of the same Act,

it is generally presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion.") (internal quotation marks omitted).

     Plaintiffs argue, on the other hand, that "categorical exclusion" is a term of

art unique to NEPA and "it is a cardinal rule of statutory construction that, when

Congress employs a term of art, it presumably knows and adopts the cluster of

ideas that were attached to each borrowed word in the body of learning from which

it was taken." (Doc. 36 at 13 (quoting *F.A.A. v. Cooper*, 566 U.S. 284, 292

(2012).) Plaintiffs point out that § 6591b(f) also borrows that word "scoping" from

the NEPA regulations, which is in itself the process through which "extraordinary

circumstances having a significant effect on [the] environment are revealed."

*Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999). As argued by Plaintiffs, § 6591b's use of these terms of art shows that Congress intended treatment projects be assessed the same as all other categorical exclusions under NEPA, including undergoing "extraordinary circumstances" review.

The District of Oregon has persuasively addressed this question, holding that "'extraordinary circumstances' review does not apply to actions categorically exempt under the 2014 Farm Bill amendments, 16 U.S.C. § 6591b, and the Forest Service [i]s not required to determine whether extraordinary circumstances required preparation of an EIS or EA." *Greater Hells Canyon Council v. Stein*, 2018 WL 3966289, at *8–9 (D. Or. June 11, 2018), *adopted*, 2018 WL 3964801 (D. Or. Aug. 17, 2018). The court based its analysis on the following: (1) § 6591b does not specifically provide a requirement for such review, (citing *Dean v. United States*, 556 U.S. 568, 572 (2009)); (2) the regulatory categorical exclusion definition by its terms limits its application: "Any procedures *under this section* shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4 (emphasis added); (3) § 6591b includes its own limitations at subsections (b) and (c); and (4) Congress has shown that it can apply "extraordinary circumstances" review when it so wishes, as it did in other HFRA provisions, *see* 16 U.S.C. § 6554. *Greater Hells Canyon Council*, at *8–9.

13

Consistent with the reasoning provided by the District of Oregon, treatment projects that meet § 6591b's requirements are excluded from "extraordinary circumstances" review. Thus, the Forest Service was not required to undertake such review and Plaintiffs' challenge on this ground fails.

## III. HFRA (Count 3)

HFRA "directs the Forest Service to take action to 'reduce wildfire risk' and 'enhance efforts to protect watersheds and address threats to forest and rangeland health.'" *WildWest Inst. v. Bull*, 547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C. § 6501(1), (3)). "Specifically, the Forest Service is required '[a]s soon as practicable' to implement an 'authorized hazardous fuel reduction project[]' on federal land where 'the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource.'" *Id.* (quoting 16 U.S.C. § 6512(a)(4)) (alterations in original).

### A. Old Growth

Projects approved under HFRA must be carried out in a manner that "maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A). "Old growth" is also addressed in the Lewis and Clark National Forest Plan, which includes the following old growth

forest objective: "A minimum of 5 percent of the commercial forest land within a timber compartment should be maintained in an old growth forest condition. A minimum stand size of 20 acres is recommended for old growth management." AR0019732. "A minimum stand size is recommended because in very small patch sizes, old growth cannot provide the environment needed for many species to function." *Id.*

Plaintiffs argue that the field survey prepared by a Forest Service entomologist and plant pathologist (the "Trip Report"), AR0004936–43 (Nov. 29, 2016), "clearly and rather unequivocally demonstrates that Unit 7, scheduled for clear-cut, is healthy old-growth habitat." (Doc. 36 at 17.) And, using Unit 7 as an exemplar, Plaintiffs maintain that the Forest Service is taking this opportunity to remove smaller old-growth stands because they do not meet the twenty-acre minimum stand size criteria. In response, the Forest Service relies on a different report, referred to as the Old Growth Report, *see* AR00197323–35 (Dec. 29, 2016), which it argues "confirm[s] that no old growth as defined by Forest Plan criteria will be removed, and patches that exhibit old growth characteristics but do not meet the twenty-acre minimum stand size will be preserved where consistent with forest resiliency goals." (Doc. 41 at 17.)

Plaintiffs are correct that the Project results in the cutting of smaller old growth stands (less than 10 acres). However, there are two reasons Plaintiffs are

incorrect that such an outcome contravenes HFRA. First, whether a stand qualifies as "old growth," depends on the size, number, and age of trees within a grouping. *See* AR0021359 (Green, et al.); AR0019733 ("[A] forest tract qualifies as [old growth] based on species-specific parameters for tree age, size, and density[.]"); AR0021383; *see also* AR0021362 (Table 3: Eastern Montana Zone Old Growth Type Characteristics). Second, Plaintiffs stop reading HFRA's limiting language after the phrase "maximizes the retention of old-growth and large trees." But HFRA goes on to state, "as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A). The Forest Service has determined that the second portion of HFRA's old growth requirement is only met for stands of a certain size, consistent with the Forest Plan. That conclusion is entitled to deference. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1129, 1236 (9th Cir. 2001).

While Plaintiffs argue that Unit 7 is entirely slated for clear cut, that is not accurate because while Units 7a and 7b are to be clear cut, *see* AR0003759 (totaling 157 acres); AR0005233–34 (Treatment Table Decisions), over 15.6 acres of old growth within Unit 7 were removed and to be retained, *see* AR0019734; *see also* AR0005395 (indicating Unit 7 was originally 175 total acres). Plaintiffs insist that comparing maps of old growth stands, AR0019761, with the proposed clearcutting map, AR0005206, shows that units containing old growth (1, 8, 17,

16

18, 19, 24, 38, 43, 31) are slated for clear cut. But once again, the Forest Service determined "old growth" that appears to fall within these units is either minimal in size or of poor quality. *See* AR0019733–34; *see also* AR011764–19031 (containing thousands of pages of old growth survey data, forming basis of Old Growth Report). And, the record shows that unit boundaries were redrawn to protect old growth. AR019733. While the total known acreage of old growth does not meet the 5 percent Forest Plan standard, projected-but-unknown old growth acres meet or exceed it. *See* AR019732.

Plaintiffs further argue that commercial logging is not necessary in these areas, once again looking to Unit 7 where the Trip Report indicates that the larger trees are "probably not attractive to attack by [mountain pine beetle] or conducive to [beetle] brood survival or development." AR0004939. However, the report further states that these older trees remain susceptible to attack from secondary insects (such as Pityogense beetles) and that dwarf mistletoe impacts in the unit remain concerning. AR0004939. The overall conclusion from the Trip Report is: "Many stands in the project area are mature and are being significantly impacted by a [sic] several insects and diseases. Without management, tree mortality from the primary insects and diseases present in the project area will continue and their impacts most likely increase." AR0004943.

17

Plaintiffs' overall reliance on the Trip Report to make old growth arguments is undercut by the fact that the purpose of the Trip Report was not to survey Unit 7 for possible old growth status, AR004936 (stating that the survey was to "evaluate insects and diseases in the . . . Project area"), and the Forest Service considered the report in reaching a number of its conclusions regarding insect and disease issues within the Project area. Plaintiffs' insistence that the Forest Service acted arbitrarily in not relying on the Trip Report in assessing old growth, a topic not directly addressed therein, lacks merit.

Similarly, Plaintiffs' argument that dwarf mistletoe positively impacts forest ecology contradicts the Forest Service's conclusion to the contrary. As explained by the Forest Service, the dwarf mistletoe infestation in combination with other attacks could lead to higher tree mortality, AR0005228, a conclusion reinforced by the Trip Report, *see* AR0004942 ("Dwarf mistletoe distorts growth (with may increase ladder fuels), reduces growth rates, and eventually causes tree mortality."). The record states that thirty-seven percent of the lodgepole pine forest type in the Lewis and Clark Forest is affected by dwarf mistletoe, which "reduces tree growth, wood quality, seed production ability, and life span of infected trees." AR0005228. Because the record provides a "basis in fact" for the

Forest Service's position on dwarf mistletoe, the agency's conclusion is entitled to deference.[3] *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

Ultimately, Plaintiffs' insistence that no old growth can be removed under HFRA is not consistent with the statute and their old-growth challenge on fails.

## B. Best Available Science

HFRA further requires that forest restoration treatments "consider[] the best available scientific information to maintain or restore the ecological integrity" of the forest. 16 U.S.C. § 6591b(b)(1)(B). Plaintiffs argue the Forest Service did not comply with this requirement because it did not make an explicit determination that the science it chose was best regarding ecological restoration. But, the crux of the matter is really that Plaintiffs disagree with the science relied upon by the agency, insisting that the Forest Service failed to consider three studies that challenge the effectiveness of treatments in reducing wildfire risk. *See* Schoennagel et al. (2004); Brown et al. (2004); Graham et al. (2004). These studies were cited in Plaintiffs' scoping comments. *See* AR0003993–98. While these studies apply to particular geographic areas and forest types, *see* AR0003993 (Schoennagel, "high-elevation subalpine forests"), 3995 (Schoennagel, "subalpine forests" in Yellowstone), 3996 (Brown, "higher elevation" forests), 3997 (Graham,

---

[3] Plaintiffs also argue that the Forest Service did not consider the Management Guide for Dwarf Mistletoe, yet it was part of the record. *See* AR026361–74.

forests in "warmer, dryer microclimate"), the majority of the Project area is "middle elevation 'montane' conifer stands that have been shown to have a relatively frequent fire return interval," AR0005391. The stands in question were identified as departing from historic conditions. AR0021566–78.

As explained in the Forest Service's "Fire, Fuels and Air Report," the agency chose to rely on site-specific fire ecology studies and discussion of historical fire conditions in the Project area. *See* AR0020198–223 (Barrett (1993)); AR0021551–606 (Helmbrecht et al. (2012)), AR0023418–48 (Leiburg (USGS 1904)). More specifically, the agency relied on a 2012 Landscape Assessment of the Little Belt Mountains, *see* AR0005391, historic fire data in the County's Community Wildfire Protection Plan, AR0005392–93, 5399–402, and the Guidance for Implementation for Federal Wildland Fire Management Policy (2009), *see* AR0005237–56. The Forest Service is entitled to rely on studies it deems reliable. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012). Although the Forest Service did not directly address the studies cited by Plaintiffs, its decision and the reasons for it can be "reasonably . . . discerned" from the record. *Bahr v. Envt'l Prot. Agency*, 836 F.3d 1218, 1229 (9th Cir. 2016) ("Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned.") (internal quotation marks omitted).

20

Ultimately, "best available science" falls in the category of agency expertise.

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference."). Given the information presented here, Plaintiffs' argument is at best indicative of a "difference in view," which is insufficient to make the Forest Service's actions arbitrary or capricious. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the Federal Defendants' and Defendant-Intervenors' motions for summary judgment (Docs. 28, 32) are GRANTED. Plaintiffs' motion (Doc. 11) is DENIED. The Clerk of Court is directed to enter judgment consistent with this Order and close the case.

DATED this 19 day of November, 2018.

11:07 A.M.

Donald W. Molloy, District Judge
United States District Court